UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| **JENNIFER LYNN GARDNER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )  Cause No. 2:12-cv-217-WTL-WGH |
| | ) |
| **CAROLYN W. COLVIN, Acting** | ) |
| **Commissioner of the Social Security** | ) |
| **Administration**[1] | ) |
| | ) |
| **Defendant.** | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Jennifer Lynn Gardner requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II of the Social Security Act (the "Act"). The Court rules as follows.

### I.     PROCEDURAL BACKGROUND

Gardner filed for SSI and DIB on October 7, 2009, alleging disability beginning on December 31, 2005, due to mental and physical impairments. Her application was denied initially and upon reconsideration, whereupon she requested and was granted a hearing before an Administrative Law Judge ("ALJ"). At the hearing, which was held via videoconference on November 16, 2010, Gardner appeared before ALJ Michael McShane. Gardner was represented by counsel. A medical expert, a vocational expert, and Gardner testified. Thereafter, on December 20, 2010, the ALJ rendered his decision in which he concluded that Gardner was not

---

[1] Carolyn W. Colvin became Acting Commissioner of the Social Security Administration after this case was filed. She is therefore substituted as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

disabled under the Act. The Appeals Council denied Gardner's request for review of the ALJ's decision. After an extension of time was granted by the Appeals Council, Gardner filed this timely action for judicial review.

## II.  EVIDENCE OF RECORD

### A.  Dr. Gonzalez's Opinion

Dr. John Gonzalez, a licensed psychiatrist, first started treating Gardner in May 2006. In his May 2006 evaluation, Dr. Gonzalez noted Gardner's chief complaint of depression precipitated by stressors in her personal life, as well as obesity and hypothyroidism. Dr. Gonzalez opined that Gardner's mood improved with medication. Gardner stated she was having problems with concentration, decreased appetite, anhedonia, and panic attacks. Gardner was currently living with a boyfriend and she denied alcohol or drug abuse. Dr. Gonzalez made the following observations: "cooperative, affect is appropriate, mood is depressed, denies suicidal or homicidal ideation, denies signs and symptoms of psychosis, concentration is intact, immediate, recent and delayed memory is intact, insight and judgment is good." Dr. Gonzalez diagnosed major depressive disorder with panic attack disorder, as well as hypothyroidism and obesity, and assessed a Global Assessment of Functioning ("GAF") of 50. Dr. Gonzalez advised Gardner to continue taking medication for her symptoms.

Dr. Gonzalez continued to treat Gardner in the following few years and tracked changes in her mental status. Overall, Dr. Gonzalez noted the same mental status of depression with a lack of suicidal ideation, fair memory and concentration, and good insight and judgment. On September 1, 2009, Dr. Gonzalez noted that Gardner had obtained a second prescription for Ativan from her cardiologist, about which he confronted her. Gardner explained that she was

under an increased amount of stress at the time, but Dr. Gonzalez noted that Gardner's mental status had not deteriorated.

On October 15, 2009, Dr. Gonzalez completed a Report of Psychiatric Status. In this report, Dr. Gonzalez noted Gardner's major depressive disorder, as well as hypothyroidism and obesity. Dr. Gonzalez assessed Gardner a GAF of 45. Dr. Gonzalez noted symptoms of depression, anergia, hopelessness, low energy, lowered concentration, low self-esteem, irritability, and diminished recent memory. In regard to her functional capacity, Dr. Gonzalez rated Gardner as "fair" in her current daily activities, "withdrawn" in her social interaction, "fair" in her ability to attend to a simple work routine on a consistent basis, and "poor" in her stress tolerance. Dr. Gardner opined that Gardner would be limited by lowered concentration, low energy, irritability, social withdrawal, and low self-esteem. Dr. Gonzalez rated a "poor" current prognosis and "poor" current therapy and response, although he did note "fair" signs of progress.

On February 24, 2010, Dr. Gonzalez completed a second Psychiatric Review Technique form. Dr. Gonzalez assessed a current GAF of 45 and a past GAF of 55. Dr. Gonzalez assessed symptoms of depression, anergia, severe anxiety, poor concentration, low self-esteem, irritability, hopelessness, suicidal ideation, and poor recent memory. As to Gardner's functional capacity, Dr. Gonzalez rated Gardner as "fair" in current daily activities, "poor" in her social interaction, "poor" in her ability to attend to a simple work routine on a consistent basis, and "poor" in her stress tolerance. Dr. Gonzalez opined that Gardner's "cognition is impaired, primarily concentration, irritability, depression, low energy, lack of interest and severe anxiety." Dr. Gonzalez assessed a "fair" current prognosis and "fair" response to treatment, as well as "good" signs of progress.

On April 6, 2010, Dr. Gonzalez observed that Gardner's mood was still depressed, although markedly improved from previous check-ups. Gardner's son had started working, which relieved some of her anxiety, and her energy, mood, and appetite appeared to be good. Gardner's improved mood was noted in following check-ups, where Dr. Gonzalez noted Gardner responded well to new medication.

On June 29, 2010, Gardner appeared to be "stressed out," but overall her mental status had not changed. On July 29, 2010, Gardner appeared to be stressed out and depressed, and even thought of harming herself, but "her son came in" before she acted. After reporting this incident to Dr. Gonzalez, Gardner denied having any thoughts of harming herself and stated that "she [currently] felt safe with her safety." Nevertheless, Gardner reported feeling depressed, sluggish, and poorly motivated. Dr. Gonzalez increased the dosage of her Cymbalta.

On August 30, 2010, Dr. Gonzalez opined that Gardner's mood had improved and Gardner was getting along better with her husband. The last treatment note of record on September 24, 2010, reflects assessments that Gardner's affect was appropriate, her mood was depressed but better, she had no suicidal or homicidal ideation, no signs or symptoms of psychosis, good concentration and memory, and good insight and judgment. Gardner was advised to continue taking psychiatric medication.

### B.      Dr. Johnson's Opinion

Dr. Amy Johnson, a state agency consultant, reviewed Gardner's case file on December 21, 2009, to determine the severity of Gardner's mental impairments. Dr. Johnson determined that Gardner's impairments did not meet or equal any listing, but concluded that a residual functional capacity ("RFC") assessment was necessary and Gardner had coexisting non-mental impairments that required referral to another medical specialist. Dr. Johnson acknowledged

4

Gardner's major depressive disorder but found that it did not precisely satisfy the diagnostic criteria for Listing 12.04. In assessing what degree of limitation Gardner's mental impairments imposed on her functional capacity, Dr. Johnson assessed mild restriction of her activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Dr. Johnson also found that the medical evidence did not satisfy the presence of "paragraph C" criteria of Listing 12.04.

Dr. Johnson also completed a mental RFC assessment for Gardner. Dr. Johnson found Gardner moderately limited in the following domains: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; and the ability to respond appropriately to changes in the work setting. Dr. Johnson found Gardner was not significantly limited in any other domain. Dr. Johnson noted Dr. Gonzalez's opinion that Gardner's ability to attend to simple routine tasks was fair with poor stress tolerance. Dr. Johnson gave controlling weight to this opinion, explaining it was from a treating physician. Dr. Johnson noted Gardner currently took psychiatric medication and her functioning suggested that she was able to perform a wide range of activities including driving, caring for children, cooking simple meals, helping kids with homework, shopping, counting change, writing checks, caring for cats, doing laundry, washing dishes, and talking on the phone. Dr. Johnson also highlighted three reports indicating that Gardner could do simple tasks. Dr. Johnson opined that Gardner had decreased concentration but required no reminders, and she got along fine with store personnel and authorities but did not

like to be around crowds. Dr. Johnson noted Gardner reported she could pay attention with no problems and follow instructions well. Dr. Johnson concluded:

> Careful consideration has been given to the claimant's statements regarding alleged symptoms and their effects on functioning. Claimant's allegations of [symptoms] appear credible as these are supported by Consultant and ME. However, in terms of level of severity of functioning [claimant]'s allegations appear partially credible given [activities of daily living] appear [within normal limits], attention and concentration are moderately impacted but appear reasonable for tasks, and [claimant] appears to be able to tolerate superficial, casual interactions with others.
>
> Claimant has the mental capacity to understand, remember, and follow simple instructions. [Claimant] is restricted to work that involves brief, superficial interactions with fellow workers, supervisors and the public. Within these parameters and in the context of performing simple, routine, repetitive, concrete, and tangible tasks, [claimant] is able to sustain attention and concentration skills to carry out work like tasks with reasonable pace and persistence.

### C. Dr. Patel's Opinion

Dr. Pragna Patel examined Gardner on September 2, 2010, for pain in her left upper extremity. Dr. Patel conducted electromyography and a nerve conduction study for pain and paresthesis in her left hand radiating up into her elbow and at times into her shoulder. As a result of these tests, Dr. Patel diagnosed Gardner with mild left carpal tunnel syndrome, but no evidence of ulnar nerve compression at her elbow or her wrist on the left side. Dr. Patel did not opine as what degree of limitation Gardner's left carpal tunnel syndrome would impose on her functional capacity.

### D. Dr. Bond's Opinion

On December 23, 2009, Dr. Amin Bond conducted an RFC assessment of Gardner's physical impairments. Based on the evidence in Gardner's case file, Dr. Bond concluded that Gardner had no exertional limitations, postural limitations, manipulative limitations, visual limitations, or communicative limitations. Dr. Bond opined that Gardner should avoid

6

concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. Dr. Bond also opined that Gardner should avoid all exposure to hazards (*e.g.*, machinery, heights, etc.). In regard to the alleged severity of her symptoms, Dr. Bond concluded that Gardner was only partially credible as objective testing and examinations were "unremarkable." Dr. Bond noted there was no medical source statement regarding the claimant's physical capacities in the case file.

### E.   Dr. Spector's Testimony

Dr. Morris Spector testified at the oral hearing regarding Gardner's physical impairments. Dr. Spector testified that Gardner suffered from depression and anxiety characterized by multiple visits to the hospital concerning non-cardiac chest pain. Examination did not reveal any serious cardiovascular problems. Dr. Spector testified Gardner took medication for her depression and anxiety and was diagnosed with endometriosis, fibromyalgia, and carpal tunnel syndrome. Dr. Spector opined that Gardner should be limited to a sit/stand option of mostly sitting, very little walking. Dr. Spector also opined that Gardner had occasional limitations with fine manipulation due to carpal tunnel syndrome, but Gardner would have no problem with gross manipulation or reaching overhead. Although Gardner's COPD did not meet a listing, Dr. Spector recommended that Gardner be limited in regard to atmospheric conditions. Dr. Spector testified that Gardner's impairments did not singly or in combination meet or equal a listing.

### F.   Gardner's Testimony

Gardner testified that she was 46 years old, 5'2" and weighed 210 pounds, although she stated her normal weight was 160 pounds. She attributed her weight gain to inactivity. She was divorced with four children, two of whom lived with her. She was able to drive, but limited her driving to going to the store due to back problems. However, she drove 58 miles to the hearing.

She earned her GED after completing tenth grade and had not been in special education classes. She understood basic math and could count change.

She completed training for her past work, which took six weeks. She had previously served as an administrative specialist in the National Guard for a year, but was honorably discharged after failing to complete a test. She had last worked as a certified nursing assistant ("CNA") for six years, and prior to that she had worked at Square Donuts for a year. She held a variety of other positions related to home health care. Her position as a CNA required heavy lifting on a regular basis. She had not worked since 2005, except for a temporary position at Outback Steakhouse for which she earned $135 in 2008.

Gardner stated she had problems involving mitral valve prolapse, high blood pressure, COPD, depression, and anxiety. Her lungs hurt her the most and she used inhalers. Her cardiologist had discussed the possibility of performing a cardiac catheterization. She was taking medication to treat her high blood pressure and thyroid problems, but the side effects of these medications caused her to be drowsy on a regular basis. She tried to find a better medication, but was unsuccessful.

Gardner was able to walk five minutes before she ran out of breath and was able to stand for twenty minutes before needing to sit. She was able to sit for about twenty to twenty-five minutes. She could bend over at the waist and reach down to the floor to pick up a pencil, but she would be out of breath on rising again. Upon squatting, she would be unable to return to an upright position. She was left-handed and could button her shirt with her fingers. However, she was unable to pick up objects and hold onto them safely "when [her] carpal tunnel is maxing up," which occurs approximately twice a week. Her carpal tunnel syndrome was not a recent

development, although it was diagnosed only a few months prior to the hearing. Gardner could lift one gallon of milk, but not two, because she would run out of breath.

As for her mental health issues, Gardner had been taking medication for five years and was in therapy once or twice a month during that time. The therapy was not helpful, but her medications calmed her down. She was experiencing some memory loss, and her concentration was not good. She watched cooking shows, cartoons, and the news, but was unable to specifically recall a news event that occurred in the week preceding the hearing. She could watch a movie from start to finish and recall and communicate the parts of the movie that interested her. She became anxious around crowds of four or more people, and she did not like to interact with strangers. She was taking Cymbalta and Ativan, and previously had taken Xanax but discontinued usage because it was ineffective.

She had trouble sleeping and was taking Doxepin and Lunesta. The medication made her sleepy, but she was "still up and down." She cared for her own personal hygiene and sometimes cooked, but her live-in boyfriend helped around the house. Gardner went grocery shopping, did dishes, and swept, but would run out of breath and have to lie down. She denied doing any yard work. On a typical day, she would get up and make coffee, go to the bathroom, watch the news, cook her youngest child breakfast, help her get dressed and walk her to the school bus, although on some occasions her boyfriend would help when she didn't feel like it. She napped every day for two-and-a-half hours in the afternoon while her youngest child was in preschool. She did not visit anyone, attend church, or go to meetings.

Gardner testified she spent most of the day lying down to cope with her pain and breathing problems. Gardner felt that if she were not able to lie down over the course of an eight-hour day but could sit or stand at her discretion, she would have to be hospitalized. She clarified

that her doctors wanted to hospitalize her, but she would not consent because she did not want to leave her children. Gardner's mood was "like a dark cloud," and she wanted "to get into a deep, dark hole and stay there." She also had a temper, which when provoked causes her to contemplate self-harm. She took a knife to her arm three months prior to the hearing, which she reported to her psychiatrist. She had crying spells that could be brought on by anything. She also experienced suicidal ideation but she would not act on it.

### III.  STANDARD OF REVIEW

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b).[2] At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of

---

[2] The Code of Federal Regulations contains separate sections relating to DIB and SSI that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to DIB sections only.

Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

On review, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue,* 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon,* 270 F.3d at 1176.

## IV.    THE ALJ'S DECISION

At step one, the ALJ found that Gardner had not engaged in substantial gainful activity since December 31, 2005. At step two, the ALJ concluded that Gardner had the following severe impairments: obesity; COPD; fibromyalgia; a history of non-cardiac chest pain with a mitral valve disorder; peripheral vascular disease; thoracolumbar spine degenerative disc disease; and major depressive disorder. At step three, the ALJ determined that Gardner's severe impairments did not meet or medically equal a listed impairment. At step four, the ALJ concluded that

Gardner had the residual functional capacity to "lift/carry 10 pounds frequently and 10 pounds occasionally; stand/walk 2 hours in an 8-hour day; and sit 6 hours in an 8-hour day." The ALJ also found that Gardner required a sit/stand option to allow her to change to change position at will. Gardner could not climb ramps, stairs, ropes, ladders, or scaffolds, but she could occasionally balance, stoop, kneel, crouch, and crawl. Gardner should not have any exposure to extreme heat or cold, or fumes, noxious odors, gases, chemicals, poor ventilation, or dust. The ALJ limited Gardner from working at unprotected heights or around dangerous moving machinery. The ALJ limited Gardner to occasional contact with the general public and simple – one to three step – procedures that are routine and repetitive without frequent changes in duties. At step four, the ALJ then found that Gardner could not perform her past relevant work. At step five, considering Gardner's age, education, work experience, and RFC, the ALJ found Gardner could perform jobs existing in the national economy in significant numbers. Therefore, the ALJ concluded that Gardner was not under a disability, as defined in the Act, from December 31, 2005, through the date of his decision.

## V.    DISCUSSION

Gardner contends the ALJ erred in finding Gardner was not disabled at step three due to a perfunctory analysis of her mental limitations. Gardner argues that even if she was not disabled at step three, the ALJ erred at step four in making an RFC finding that failed to accurately reflect Gardner's mental and physical limitations. Finally, Gardner argues that the ALJ presented a faulty hypothetical to the vocational expert, which led to the ALJ making a step five finding that was not supported by substantial evidence. The Court will address each argument in turn.

### A.    Mental Impairments

Gardner contends the ALJ erred at steps three, four, and five of his analysis regarding his evaluation of her mental impairments.

*1.     Step Three Analysis*

Gardner contends that the ALJ erred at step three in finding that Gardner's mental impairments did not meet or equal Listing 12.04. At step three of the disability inquiry, an ALJ must determine whether the claimant's impairments meet or equal the criteria of an impairment listing. While the claimant retains the burden of showing her impairments satisfy all of the criteria specified in a listing, the ALJ must discuss the specific listings he is considering and offer more than a perfunctory analysis of the listing. *E.g.*, *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). A failure to do so may require a remand. *Id.*

Under the "treating physician rule," an ALJ must give controlling weight to the medical opinion of a claimant's treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence. 20 C.F.R. § 404.1527(d)(2); *see, e.g.*, *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). However, when a treating physician's opinion does not provide specific evidence that a listing is met or equaled, and a claimant presents no other evidence to contradict the state agency consultant's opinion, the ALJ need not articulate his reasons for accepting the state agency consultant's opinion. *Scheck v. Barnhart*, 357 F.3d 697, 700-01 (7th Cir. 2004).

Here, the ALJ determined that Gardner's mental impairments did not meet or medically equal Listing 12.04. In support of this determination, the ALJ assessed the "paragraph B" criteria:

> In activities of daily living, the claimant has mild restriction. In social functioning, the claimant has moderate difficulties. With regard to concentration, persistence, or pace, the claimant has moderate difficulties. As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

The ALJ concluded that Gardner's mental impairments did not satisfy the "paragraph B" criteria. The ALJ then concluded that Gardner's mental impairments did not meet the "paragraph C" criteria of Listing 12.04.

Gardner argues that the ALJ did not articulate what evidence he relied on in making his Listing 12.04 findings, thus precluding meaningful judicial review. The Court agrees. The Commissioner argues that "it is evident from the ALJ's evaluation of the medical evidence at step five that he adopted the December 2009 Mental RFC Assessment of a State agency reviewing psychologist, Dr. Amy Johnson, whose paragraph B assessment mirrors his own findings." The ALJ's findings do mirror Dr. Johnson's assessment, and later, in his step five analysis, the ALJ relies on Dr. Johnson's opinion in determining Gardner's mental RFC. However, even if the ALJ implicitly relied on Dr. Johnson's assessment, he failed to articulate the reason for his reliance on that assessment to the exclusion of the opinion of Gardner's treating physician, Dr. Gonzalez.

Dr. Gonzalez completed Report of Psychiatric Status forms in 2009 and 2010. When asked to describe the extent to which Gardner initiated and participated in activities independent of supervision or direction, Dr. Gonzalez assessed her as "fair" in both his 2009 and 2010 reports. Likewise, when asked to describe Gardner's relationships with others and how she responded to criticism, Dr. Gonzalez noted "withdrawn" in 2009 and "poor" in 2010. In describing Gardner's ability to attend to a simple work routine on a consistent basis, Dr. Gonzalez assessed her as "fair" in 2009 and "poor" in 2010. With regard to episodes of decompensation or deterioration that occurred in situations similar to those that might be encountered at work, Dr. Gonzalez assessed Gardner as "poor" in 2009 and 2010.

The ALJ did not even acknowledge these reports, much less did he articulate their impact on his listing analysis.[3] This is error. On remand, the ALJ must articulate first whether he gave Dr. Johnson's assessment controlling weight, and, if so, why he credited Dr. Johnson's assessment over Dr. Gonzalez's.[4]

2. *Step Four RFC Analysis*

Gardner next argues that the ALJ failed to properly consider her mental impairments at step four, thus leading to an incorrect RFC finding.

An ALJ may rely on a state agency consultant's opinion as substantial evidence in making an RFC finding. 20 C.F.R. § 404.1527(e)(2)(ii). However, an ALJ must give controlling weight to the medical opinion of a claimant's treating physician if it is well-supported by medical findings and not inconsistent with the other substantial evidence. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). "An ALJ may not selectively consider medical reports,

---

[3] Gardner also contends that the ALJ did not adequately assess whether Gardner's obesity contributed to Gardner's mental impairments, thus reaching the level of severity required to meet Listing 12.04. Obesity by itself is not a listing but may act to exacerbate an existing impairment to the point of meeting or equaling a listing. SSR 02-1p. Inasmuch as the ALJ reviewed records that incorporated Gardner's obesity, it factored indirectly into his analysis. Furthermore, given that Gardner does not point to any evidence that her obesity did exacerbate her mental impairments to the point of meeting or equaling Listing 12.04, any error in this regard would be harmless. *See, e.g.*, *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006).

[4] Gardner also argues that the ALJ erred in failing to call a medical expert to testify at the hearing regarding Gardner's mental impairments. "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *see* 20 C.F.R. § 404.1526(b).
    Dr. Johnson opined that Gardner did not meet or medically equal a listing, and the ALJ was entitled to rely on Dr. Johnson's opinion regarding Gardner's mental impairments. SSR 96-6p. ("Other documents, including the Psychiatric Review Technique Form . . . may also ensure that this opinion has been obtained at the first two levels of administrative review."). However, it is unclear whether the ALJ did so, and if so, whether and why he did so to the exclusion of Dr. Gonzalez's assessment. On remand, if the ALJ does not rely on Dr. Johnson's assessment, it may be necessary to call a medical expert.

especially those of treating physicians, but must consider all relevant evidence." *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) (quotation marks omitted).

Here, the ALJ found that Gardner was limited to occasional contact with the general public and simple (one to three step) procedures that are routine and repetitive without frequent changes in duties. The ALJ reviewed Dr. Gonzalez's treatment records before concluding that his "findings indicate [that Gardner's] depressive symptoms have substantially improved with treatment during the time in issue. These records also indicate [that] the claimant acts as caregiver to a child and retains the ability to maintain social relationships." He noted that Dr. Gonzalez had assessed a GAF of 45 in October 2009, but pointed out that "this opinion came shortly after the claimant was noncompliant with treatment" and "subsequent treatment records document the claimant's mood quickly improved and that her memory and concentration remained normal."

As Gardner reads the ALJ's decision, he "rejected" Dr. Gonzalez's October 2009 Report of Psychiatric Status for medication non-compliance and improperly interpreted these records. The Court does not read the ALJ to discredit the whole of Dr. Gonzalez's opinion due to medication non-compliance. Rather, when read in context, the ALJ merely qualified the GAF scores from the October 15, 2009, report given the events surrounding that assessment. However, with regard to Gardner's second point, the Court agrees. Although the ALJ discussed Dr. Gonzalez's opinion at length in his step four analysis, he drew his own conclusion as to what those records showed and that conclusion was contrary to the doctor's own notes. Importantly, the ALJ failed to address Dr. Gonzalez's 2010 report, in which the doctor opined that Gardner's ability to attend to a simple work routine on a consistent basis was "poor."

16

The ALJ failed to minimally articulate what weight he gave Dr. Gonzalez's opinion as a whole. Instead, it appears that he cherry-picked parts of Dr. Gonzalez's opinion that supported his mental RFC finding and either ignored or improperly discounted parts of Dr. Gonzalez's opinion that showed Gardner was more limited than what the ALJ found. As such, the Court must remand for further articulation and findings of fact.[5]

### 3. Step Five Analysis

Gardner argues that because the ALJ's RFC failed to account for Gardner's limited ability to maintain concentration, persistence, or pace, a remand is necessary. The Court agrees. As discussed previously, the ALJ failed to properly articulate what weight he gave Dr. Gonzalez's opinion regarding Gardner's mental limitations. As a result, the Court cannot determine whether substantial evidence supports the ALJ's determination. On remand, after assessing Dr. Gonzalez's opinions at steps three and four, the ALJ should adjust the hypothetical questions he poses to the vocational expert to reflect his new RFC determination.

### B. Obesity

Gardner also contends that the ALJ failed to consider how Gardner's obesity would impact her RFC at step four. Gardner argues that had the ALJ considered her obesity, he would not have found that Gardner could stand or walk for two hours each workday.

In determining a claimant's RFC, the ALJ must consider a claimant's combined impairments. SSR 96-8p. When an ALJ identifies obesity as a medically determinable impairment, the ALJ must consider any functional limitations resulting from the obesity in the

---

[5] To the extent that Gardner argues that her RFC should be derived primarily from her GAF scores, the Seventh Circuit has noted that "the score does not reflect the clinician's opinion of functional capacity" and "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (quotations omitted).

RFC assessment, in addition to any limitations resulting from any other physical or mental impairments the ALJ identifies. SSR 02-1p.

In assessing the claimant's RFC, the ALJ must also consider the claimant's statements as to her limitations. In the determining the credibility of those statements, an ALJ must consider several factors, including the claimant's daily activities, level of pain or symptoms, aggravating factors, medication, treatment, and limitations, 20 C.F.R. § 404.1529(c); SSR 96-7p, and justify his finding with specific reasons. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). "[T]he ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Id.* At the same time, district courts "afford a credibility finding 'considerable deference,' and overturn [a finding] only if 'patently wrong.'" *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Carradine v. Barnhart,* 36 F.3d 751, 758 (7th Cir. 2004)).

Here, the ALJ identified obesity as a severe impairment in his step two analysis, and as such was required to consider any functional limitations resulting from the obesity in his RFC assessment. Ultimately, the RFC the ALJ found for Gardner limited her to sedentary work with standing and walking two hours in an eight-hour day and sitting six hours in an eight-hour workday. However, the ALJ's assessment is so superficial as to preclude meaningful review of his decision as to Gardner's obesity and her alleged limitations. Specifically, there is no apparent basis for the ALJ's determination that Gardner could walk or stand for two hours in a workday. Dr. Spector's testimony at the hearing was that Gardner should be restricted to sedentary work with a sit/stand option of mostly sitting and very little walking. Although the ALJ purports to adopt Dr. Spector's opinions regarding Gardner's limitations, on its face the ALJ's assessment is at odds with the doctor's recommendations.

Furthermore, Gardner's own testimony on this point was that she could walk five minutes, stand twenty minutes, lift a gallon of milk, and sit for twenty to twenty-five minutes. After summarizing Gardner's hearing testimony, the ALJ found that "[t]he clinical findings, the claimant's conservative treatment history, her response to treatment, her daily activities, the medical source opinion evidence, and the record as a whole indicate that she remains able to sustain work activity." This explanation for discrediting Gardner's alleged limitations is so all-encompassing that it amounts to no analysis at all. The ALJ's decision must be therefore be remanded so that the ALJ may specifically address what evidence in the record supports his conclusion that Gardner can stand and walk for two hours in a workday.[6]

## C. Carpal Tunnel Syndrome

Gardner takes issue with the ALJ's restrictions related to her carpal tunnel syndrome. The Court notes that the ALJ's opinion as written can be read as refusing to consider those restrictions solely because the carpal tunnel was found not to be a "severe" impairment. If so, that was error. All medically determinable impairments, including those that are not severe, should be considered in assessing an RFC. 20 C.F.R. § 404.1545(a)(2). On remand, the ALJ should address Gardner's carpal tunnel syndrome and its effect on her RFC.[7]

---

[6] Gardner also contends that the ALJ improperly discounted her reported limitations because "she drives to the store and that she was able to drive 58 miles to the hearing site." However, the ALJ's statement about Gardner's driving habits was in the context of his summary of her testimony, and there is no analysis to suggest that he specifically discounted her credibility on the basis of these statements.

[7] Gardner also takes issue with whether the number of jobs in the regional or national economy as assessed by the VE were significant under the statute. Given the Court's ruling on the issues preceding the testimony of the VE, the Court expresses no opinion on this argument.

19

## VI. CONCLUSION

For the reasons set forth above, the Commissioner's findings were either unsupported by substantial evidence or otherwise in error, thus leading to an unsupported determination. Accordingly, the decision of the Commissioner is **REVERSED** and **REMANDED.**

SO ORDERED:   08/27/2013

*William T Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.